State ex rel. Lexington & St. Louis R.R. Co. v. Saline County Court.

STATE *ex rel.* LEXINGTON & ST. LOUIS RAILROAD COMPANY, Petitioner, *v.* SALINE COUNTY COURT, Respondent.

1. *Corporations — Railroads — Subscriptions to, vote upon — Definite amount of stock must be voted for.* — The law authorizing the Saline County Court to subscribe stock in the Lexington & St. Louis Railroad Company, expressly provided that the subscription should not be made unless a majority of the taxpayers should vote for it, "specifying the amount." The order of the County Court submitting the question to the people called on them to vote for or against an amount "not exceeding $70,000," leaving the precise amount undetermined. The entry in the records of the County Court, subsequent to the vote, declared that the election resulted "in favor of levying a tax of $70,000, to subscribe the same to the capital stock of the Lexington & St. Louis Railroad." In *mandamus* against the court to compel the issue of the bonds, and levy of tax for their payment: *Held,* that such entry was not a conclusive finding of the court of the fact that the taxpayers voted to subscribe the specific sum of $70,000, but that under a fair interpretation of the record, it showed merely that the question submitted had received a majority of the votes. The bonds of a county can be made valid only by a substantial compliance with the law that authorizes their issue; and the failure of voters to specify their amount, in the case at bar, rendered bonds issued in pursuance of such vote invalid.

## Petition for mandamus.

*A. & T. A. Green,* for relator.

I. The finding of the County Court is conclusive in this case, and can not be collaterally inquired into. The presumption is that such finding was correct, and that the bonds were legally issued, and the court is estopped by their own recitals of record from controverting or impeaching the legality. of the election. (21 How. 539; 33 Mo. 440.).

II. The railroad company was an innocent purchaser. (Sess. Acts 1860, pp. 455–6.)

*W. Adams* and *J. R. Vance,* for respondent.

Under the law, the County Court had no power to subscribe any amount whatever unless the precise amount to be subscribed had first received a majority of the votes of the tax-payers of the district at an election held for that purpose. The power to subscribe is a statutory power, and can only arise when the terms of

the statute have been strictly complied with. (Sess. Acts 1860, pp. 455–6; 2 Redf. on Railw. 403; Mercer County v. Pittsburg & Erie R.R., 27 Penn. St. 389, in point; Starin. v. Genoa, 23 N. Y. 449; Fowler v. St. Joseph, 37 Mo. 237–8; 41 Mo. 230; State, etc., v. Boon, 44 Mo. 254.)

BLISS, Judge, delivered the opinion of the court.

On the 22d of January, 1861, the General Assembly passed an act authorizing a certain subscription to the stock of relator, and the following is a copy of section 1: "Section 1. It shall be the duty of the County Court of Saline county, for and on behalf of the tax-payers owning taxable property in all that district or territory in said county comprising Salt Pond township, and that portion of Grand Pass township lying south of sectional line beginning at the northwest corner of Col. McDowell's farm in said county, and running west to the Lafayette county line, to subscribe to the capital stock of the Lexington & St. Louis Railroad Company an amount not exceeding seventy thousand dollars, upon the condition that said road be located north of the town of Brownsville in said county, provided such subscription shall not be made unless a majority of said tax-payers, at an election to be held in said district, shall vote in favor of such subscription, specifying the amount."

The act further provides that the issuing of bonds on behalf of said district, the assessment of taxes to meet them, the appointment of an agent to make the subscription, etc., all shall be done by the County Court.

On the 4th of February following, the County Court ordered an election in said district, to be held on the 18th of February inst., to decide "as to whether they (the tax-payers of said district) shall subscribe to the capital stock of the Lexington & St. Louis Railroad Company an amount not exceeding seventy thousand dollars," and that the sheriff give notice, etc. On the 23d of February the county clerk canvassed the vote which was taken on the day for electing delegates to a State convention, embodying it in the canvass of the whole county, in which he recites that the election was held "on the 18th day of February,

A. D. 1861, for delegates to the State convention, and to take the sense of the tax-payers of Salt Pond and Grand Pass townships as to the propriety of subscribing $70,000 to the Lexington & St. Louis Railroad," etc., which canvass shows that 292 votes were cast "for railroad," and 111 votes "against railroad." On the 2d of April next the following proceedings were had in said County Court, to-wit: "It appearing to the court that the election provided for by law approved January 22, 1861, to be held in Salt Pond township, and that portion of Grand Pass township lying south of sectional line beginning at the northwest corner of Col. McDowell's farm in said county, and running west to the Lafayette county line in this county, has been held according to law, and resulting in a vote of a majority of the tax-payers of said township or district designated in favor of levying a tax of $70,000, to subscribe the same to the capital stock of the Lexington & St. Louis Railroad: now, then, it is therefore ordered by the court that William B. Kinkaid be and he is hereby appointed and empowered, as the agent of this court, to do whatever said agent may do under and by virtue of such act aforesaid."

Bonds to the amount of $70,000 were on the 16th of April duly issued and delivered to Mr. Kinkaid, the agent, and the amount and description of each was spread upon the record; but on the 2d of February, 1864, an order was made upon said agent to report the disposition he had made of the bonds, and on the 15th he reported that he had delivered a part to the company, amounting to $14,000, and that the remainder were still in his possession. Those remaining undelivered he passed over to the court, and was discharged as agent.

Immediately after the appointment of said Kinkaid as agent, the books of the railroad company showed that he made a subscription to its capital stock in the sum of $70,000. It is also shown that the relator suspended work upon the road during the war, but that within the last year it has nearly completed the bed of the same; that the road is located north of said town of Brownsville, but that, on recommencing work, a new route between Lexington and Brownsville was chosen, running into

the original line at the last-named town, which route was shorter than the old one by several miles, and distant from it when it entered Saline county from four to six miles. It is further shown that before the passage of the act of June 22, 1861, the railroad company, not then incorporated, had surveyed three routes, the one finally adopted being called the northern route; that before its adoption, citizens of Saline county interested in said route had urged it upon the company, who offered to take it upon condition of a subscription of $70,000 to the capital stock of the company, and that, in pursuance of this offer, the passage of the said act was procured and proceedings under it had. The depositions of several witnesses show that the route as changed is of far less benefit to the district on whose behalf the bonds were issued than the old one, and that on the day of the election to authorize the subscription no specific sum was named, but that the people voted " for " or " against " " railroad," according to the order of the County Court submitting the question.

The records of the County Court also show that the president of the railroad company, on the 8th day of May, 1869, demanded of the court the $56,000 in bonds retained by them, and that they were refused, and the petition asks: 1. That the said County Court be commanded to deliver to the relator the said bonds so retained by it; and, 2. That it be commanded to levy a tax upon the inhabitants of the proper district to pay the principal and interest due upon the bonds, amounting to $14,000, actually delivered by the agent of the court.

The defendant insists that the relator is not entitled to the interposition of the courts in its behalf, for various reasons. First, because the subscription to the stock and execution of the bonds was unauthorized by the tax-payers of the district. The law under which the proceedings were had, expressly provides, as before recited, that the subscription shall not be made unless a majority of the tax-payers shall vote for it, " specifying the amount." A subscription " not exceeding $70,000 " is authorized, but the specific amount must be decided by the tax-payers themselves, and without such specification, the County Court is powerless in the premises. We have, then, first to inquire whether such decision has been had.

The order of the County Court, submitting the question so far as it is evidence upon the subject, shows that no amount was specified by the vote. The tax-payers were called upon to decide, not whether there should be a subscription of $70,000, or any other specific sum, but for or against " an amount not exceeding $70,000," leaving the precise amount undetermined. It seems to have been the idea of the County Court that the tax-payers should only be called upon for a general authority, and that the court might determine the amount, or that the voters should, in some way, fix the amount themselves. The relator claims that they did so specify the amount, and, for proof, adduces the subsequent action of the court and the clerk in canvassing the votes. But that action lacks precision and clearness. The clerk, whose duties were wholly ministerial and could decide nothing, recites that a vote was had to take the sense of the tax-payers, etc., " as to the propriety of subscribing $70,000," etc., evidently referring to the submission by the County Court, which did not specify the amount, and says that 292 votes were cast " for railroad " and 111 votes were cast " against railroad." The subsequent entry in the records of the County Court says that the election resulted in favor of levying a tax of $70,000, to subscribe the same to the capital stock of the Lexington & St. Louis Railroad, when, in fact, under the law and under the order, there could have been no such vote. The vote could only have been to subscribe for stock, and not to levy a tax of any amount, and, if this entry is claimed to have the effect of a judicial finding, to be conclusive and to estop the court from disputing the facts found — to have the force of a judgment — we must scrutinize it and see what is concluded. The court, then, are concluded from denying that the people voted to levy a tax of $70,000, to subscribe the same to the stock of the company; which, as we have seen, could not be true, or, if true, goes beyond the law. Nor did the subsequent action of the court conform to any such vote; for their agent subscribed to the capital stock of the company without levying any such tax. The claims, then, of the relator so strongly insisted upon, that the fact that the tax-payers voted for a subscription of the specific amount of $70,000 has been

concluded by a judicial finding of the County Court, and can not be disputed, is altogether untenable, for it proves too much. It kills .the bonds; for, according to the finding, the subscription must be paid for by taxation, and not by bonds. Such would be its strict construction; but, by comparing it with the order of submission, its liberal interpretation would be that the question submitted had received a majority of the votes. In addition, there is parol testimony that no specific sum was voted for, but that the people simply voted for or against a railroad. The fact, then, must be taken as established, that the law in this particular was not complied with, and we have only to consider the effect of the failure upon the bonds.

It is unnecessary to say that the bonds of a county can only be made valid by a substantial compliance with the law that provides for their issue. This is especially true in relation to the authority to issue them. Some informalities in detail may be overlooked; but where the law designates the board, or the persons who must decide either in relation to their issue or their amount, that decision can not be dispensed with. If the matter is intrusted to the people of a district, they must decide it. If that people are to specify the amount, the specific amount must be submitted to their vote, and in that regard there was a fatal mistake in the case at bar. This is not a new question. In Mercer County v. Pittsburgh & Erie R.R. Co., 27 Penn. St. 389, it was held that discretionary power touching a subscription to the stock of a railroad company could not be transferred or exercised by any other person or body than the one to whom it was granted. The Legislature had authorized the commissioners of Mercer county to subscribe for shares in the capital stock of defendant; but the act provided that the amount of the subscription should be designated by a grand jury of the county. The grand jury authorized a subscription " to an amount not exceeding $150,000." The commissioners subscribed for $150,000, and issued bonds for the amount. The court enjoined the company from selling the bonds in its possession, and ordered their restitution to the county, and principally upon the ground that they were issued without authority—the grand jury, instead of

deciding the amount themselves, having transferred the decision to the county commissioners. Starin v. Genoa, 23 N. Y. 439, was an action by a purchaser of a bond, but with notice, issued by the town of Genoa to a railroad company. The condition imposed by the act authorizing its issue by the town authorities was the written consent of two-thirds of the resident tax-payers appearing on the assessment roll. The plaintiff was required to show affirmatively such written assent before he could recover on the bond.

The relator claims that its right to the bonds is sustained by the doctrine of Commissioners of Knox County v. Aspinwall, 21 How. 539, and Flagg v. Palmyra, 33 Mo. 440. In the former case, under authority of the Legislature of Indiana, the Commissioners of Knox County had subscribed for $200,000 of the capital stock of the Ohio & Mississippi Railroad Company. The bonds were regularly issued and negotiated to Aspinwall and others, who brought suit against Knox County upon the coupons that had fallen due. The defense was that sufficient notice had not been given of the election when the vote was taken authorizing the subscription. The court held that inasmuch as the board of commissioners had decided that the election was regular and issued the bonds, an innocent holder was not bound to look further. Says Judge Nelson, on page 544, " We do not say that the decision of the board would be conclusive in a direct proceeding to inquire into the facts previous to the execution of the power, and before the rights and interests of third parties had attached; but after the authority has been executed, the stock subscribed, and the bonds issued, and in the hands of innocent holders, it would be too late, even in a direct proceeding, to call it in question. Much less can it be called in question to the prejudice of a *bona fide* holder of the bonds in this collateral way." It will be seen that the court only holds that an irregularity of notice, which is not a matter of record, and could not be known to the purchaser of the bonds, shall not invalidate them in the hands of an innocent holder. It is a very different question from the one before us, for here the defect was on the record. Most of the bonds have not been issued, and those issued were

State ex rel. Lexington & St. Louis R.R. Co. v. Saline County Court.

not negotiated, and the proceeding is a direct one against the County Court, and involves the whole question.

The language of the court in Flagg v. Palmyra goes further than the last-named case, but the decision is substantially the same. The irregularities complained of did not go to the authority to issue the bonds, and the plaintiff to whom they had been negotiated was an innocent holder.

The relator claims the benefit of the protection given innocent holders of such paper, inasmuch as a consideration has been paid by building the road. But an innocent holder is something more. He must not only have paid a consideration, but be without notice, and have used all proper diligence to be informed. The relator is a direct party to the proceeding, and knew everything; and to the complaint that the consideration has been performed, it may be replied that the hardship is not all on one side. Though the change of the track of the road would not of itself release the obligation involved in the subscription so long as its written conditions were performed, yet it has defeated the main object of the subscription; and had it been located where it now runs when the vote was taken, the majority would doubtless have been the other way.

We are not disposed to encourage violations of contracts by giving importance to technical informalities. Those who voluntarily assume burdens should bear them manfully when their weight comes to be felt. If towns or counties will become stockholders in railroads or other corporations, it ill becomes them to shirk the responsibility they have assumed. But from the nature of the case, such corporations can only make contracts when authorized, and as authorized, by law. Individuals may waive irregularities by subsequent assent, but on behalf of the taxpayers there is no one authorized to waive anything.

The additional consideration should not be forgotten that the property of those who opposed this subscription is as liable to assessment as though they had favored it; thus, in a manner, it is taken for public use without consent or compensation. This can only be done by specific provisions of law, and they have a right to resist the exaction — to resist the attempt to make them

unwilling stockholders of a corporation — unless the steps of the law are substantially followed. The County Court, in the present case, are wholly powerless, except as authorized to act by those whose agents they were. No authority having been given them to subscribe any specific amount, we can not compel them by *mandamus* to complete an unauthorized procedure.

It is unnecessary to indicate what would be our action had the bonds gone into circulation and been in the hands of innocent holders, as that case has not arisen ; nor need we give an opinion upon the various other points raised by the defendant.

The writ is refused. The other judges concur.